## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| WORLDSTAR MARKETING GROUP, INC., KSR GROUP, LLC, and KLENORD RAPHAEL, | : |
| | : |
| | :   18-cv- |
| Plaintiffs, | : |
| | :   **COMPLAINT** |
| v. | : |
| | :   **DEMAND FOR JURY TRIAL** |
| BELCALIS ALMANZAR p/k/a CARDI B, | : |
| PATIENTCE FOSTER, QUALITY CONTROL | : |
| MANAGEMENT, LLC, KEVIN "COACH K" LEE, | : |
| and PIERRE "PEE" THOMAS, | : |
| | : |
| Defendants. | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

     Plaintiffs WorldStar Marketing Group, Inc., KSR Group, LLC, and Klenord Raphael, through their attorneys, Jonathan D. Davis, P.C., for their complaint against Defendants allege as follows:

### PARTIES

     1. Plaintiff WorldStar Marketing Group, Inc. ("WorldStar") is a citizen of the State of New York with its principal place of business at 244 Fifth Avenue, New York, New York. WorldStar is a corporation engaged in personal artist management.

     2. Plaintiff KSR Group, LLC ("KSR") is a citizen of the State of New York with its principal place of business at 244 Fifth Avenue, New York, New York.  KSR is a single-member limited liability company engaged in the music recording business.  Its sole member is Plaintiff Klenord Raphael, who is a citizen of the State of New York.

3.  Plaintiff Klenord Raphael a/k/a "Shaft" is a natural person, who is a citizen of the State of New York.  Shaft is the sole shareholder of WorldStar and the sole member of KSR.

4.  Upon information and belief, Defendant Belcalis Almanzar p/k/a "Cardi B" is a natural person, who is citizen of the State of New Jersey.  Cardi B is a recording artist and performer.

5.  Upon information and belief, Defendant Patientce Foster[1] is a natural person, who is a citizen of the State of Delaware.  Foster is a hair and makeup stylist and publicist.

6.  Upon information and belief, Defendant Quality Control Management, LLC ("QC") is a citizen of the State of Georgia with its principal place of business at 541 Tenth Street, NW, Suite 365, Atlanta, Georgia.  QC is a limited liability company engaged in personal artist management.   The sole members of QC are Kevin "Coach K" Lee and Pierre "Pee" Thomas.  As alleged below, each member of QC is a citizen of the State of Georgia.

7.  Upon information and belief, Defendant Kevin "Coach K" Lee is a natural person, who is a citizen of the State of Georgia.

8.  Upon information and belief, Defendant Pierre "Pee" Thomas is a natural person, who is a citizen of the State of Georgia.

## JURISDICTION AND VENUE

9.  The Court has jurisdiction over this action under 28 U.S.C. §1332(a)(1).

10. The amount in controversy in this action exceeds the sum or value of $75,000.00, exclusive of interest and costs.

11. Upon information and belief, venue for this action is properly found in this judicial district under 28 U.S.C. §1391(b)(2).

---

[1] Defendant Foster spells her first name in an unconventional manner.

12. Upon information and belief, Defendants are subject to personal jurisdiction of this Court and a substantial part of the events giving rise to the claims occurred within this judicial district.

## NATURE OF ACTION

13. This is an action against music phenom Cardi B – a performer Plaintiffs catapulted from exotic dancer and social media presence to music icon – for breach of contract, unjust enrichment, *quantum meruit*, declaratory judgment, and defamation.

14. Cardi B materially breached her exclusive management agreement with WorldStar and her exclusive recording agreement with KSR. Plaintiffs seek to have those agreements enforced and declared by the Court to be valid and enforceable for their respective terms.

15. Cardi B has not only declared the agreements to be "void and unenforceable," but she has also repeatedly defamed Shaft, falsely communicating to her fiancé Kiara Kendrell Cephus p/k/a Offset, members of her entourage, and the public that "Shaft is robbing me."

16. Upon information and belief, that lie was first communicated to Cardi B by Foster, who knew, based on conversations with Shaft, that Cardi B had entered into exclusive agreements with WorldStar and KSR. Plaintiffs also seek to hold Foster liable for her defamatory statements about Plaintiffs.

17. Plaintiffs have never robbed or otherwise committed any improper act against Cardi B. Shaft and the companies through which he conducts business, WorldStar and KSR, have always observed and fulfilled their duties to her.

18. Cardi B's fiancé is a member of the musical group Migos, which is managed by QC. Upon information and belief, Offset is responsible for steering Cardi B to QC to be managed by Thomas and Lee in all of her entertainment endeavors.

19. Upon information and belief, Defendants Foster, QC, Lee, and Thomas tortiously interfered with Cardi B's exclusive management agreement with WorldStar to secure for themselves the professional and economic benefits of Shaft's foresight and entertainment acumen, which he used to identify and sign Cardi B.

20. With actual knowledge of Cardi B's exclusive management agreement with WorldStar, Defendants Foster, QC, Lee, and Thomas, without justification, intentionally interfered with that agreement, thereby depriving WorldStar of the substantial income, benefits, and advantages it was entitled to receive under that agreement.

## BACKGROUND FACTS

21. Shaft conceived, arranged and orchestrated Cardi B's rise to become the biggest music sensation on the planet.  Owing to his vision and drive, Cardi B can now bring her talents to the world and obtain a level of success few artists ever achieve.

22. But as is sometimes the case with artists who obtain a measurable level of success, Cardi B has reneged on valid and binding agreements in an effort to cause Plaintiffs to forfeit their substantial rights and benefits in her entertainment career and to enrich herself and others who played no role in developing her career.

23. Before beginning her life-changing business relationship with Shaft in 2015, Cardi B was an inexperienced and struggling young woman from Bronx, New York.  She had made some headway as an outrageous personality on Instagram, ranting about men from her perspective and otherwise commenting on life, pop culture, and whatever piqued her fancy.  Before meeting Shaft, she had amassed approximately 100,000 Instagram followers.

24. Cardi B's rapid rise as a recording artist and performer is attributable to Shaft.  She pursued him, a fixture in the New York music scene as an artist manager, producer, and event

promoter.  She did not rap or perform music before meeting him.  Shaft recognized Cardi B's raw talent as an unconventional and edgy online personality and began managing her career.   That start took her from the strip club to the recording studio.

25. Because of his knack for identifying talent and public tastes, Shaft first transformed Cardi B into a party host, working alongside the acclaimed DJ Self, whom Shaft managed to fame and stardom.  They traveled the country together for almost a year, and then Shaft landed her a reality-television role on VH1's Love & Hip Hop, where she became a show favorite and regular.

26. That move to television quickly exploded Cardi B's Instagram following.  From there, Shaft transformed Cardi B into a rap artist, engaging his stable of producers and writers that he managed to create music for her.  By September 2016, having managed Cardi B for under two years, Shaft secured her a major-record deal with Atlantic Records in which KSR agreed to furnish her services and to deliver her records to the label, a common arrangement in the music industry that relies heavily on third parties to identify and develop talent.

27. As evidence of Shaft's management and music savvy, Cardi B received two nominations at the 2017 BET Awards and five awards at the annual BET Hip Hop Awards.  The same year, she received Grammy nominations for Best Rap Performance and Best Rap Song for her single *Bodak Yellow*, which Shaft co-produced.  Last year, she also won two iHeart Radio Music Awards.

28. *Bodak Yellow* quickly rose to the top of the *Billboard Hot 100*, replacing Taylor Swift's Grammy-award winning single *Look What You Made Me Do*.  Under Shaft's management and direction, Cardi B continued her upward trajectory.  She followed *Bodak Yellow* with three songs in which she performed as a "featured artist," appearing alongside Bruno Mars, Migos, and G-Eazy.  Each song became a *Top 10* single.

29. Based on Cardi B's mounting successes, it was obvious to those paying attention in the music industry that she would be am epic star with enormous earning potential.  Upon information and belief, QC, Lee, Thomas, and Foster were paying close attention to Cardi B and the buzz surrounding her, and sought to take advantage of WorldStar's substantial investment in Cardi B's career and become her personal manager.

30. Foster, whom Shaft had introduced to Cardi B, had firmly entrenched herself as Cardi B's confidante and publicist.  They spent much time together while touring the country and at home with each other's families.  By the end of 2017, Cardi B began souring on Shaft after listening to Foster's campaign of lies against him.

31. Foster falsely told Cardi B that Shaft was "robbing" Cardi B and cheating her out of money by making side deals at her expense.  Foster's falsehoods were uttered in the presence of others.  In addition, Foster told her then boyfriend that she had set Shaft up by falsely telling Cardi B that he was "robbing" her.  None of Foster's accusations about Plaintiffs are true.

32. Upon information and belief, at or about the time that Foster was whipping up resentment and distrust against Shaft, QC, Lee, and Thomas, together with Foster, were in contact with Cardi B.  Through their words and actions, they improperly induced her to materially breach the WorldStar exclusive management agreement.

33. Upon information and belief, Defendants QC, Lee, Thomas, and Foster accomplished and consummated their interference with the WorldStar exclusive management agreement by, among other things, condemning Shaft's handling of Cardi B's professional affairs, offering her a different and more financially advantageous management relationship, convincing her that breaching her exclusive agreement with WorldStar would inure to her benefit, and misinforming her of the true consequences of breaching that agreement.

34. Upon information and belief, Foster's introduction to QC was facilitated by Offset. Because Foster was performing services for both Cardi B and Offset, she knew he was managed by QC.  Like Foster, both Lee and Thomas were aware that Cardi B was bound under an exclusive management agreement with WorldStar.

35. Upon information and belief, as a result of Cardi B's communications with Defendants QC, Lee, Thomas, and Foster, on December 16, 2017, she texted Shaft: "I'm not f[*]cking with you nomore you dead ass doing me [] Grimmey."  After that communication, Cardi B began withdrawing from Shaft, contacting him less and less.

36. Two days later, Offset contacted Shaft, confirming that Cardi B was spreading the lie that Shaft had robbed her: "[U] better stop play acting like u don't know u taking her sh[*]t from her u a snake.  U can't hide from me N[****] and u not bout to play my WIFE."

37. After those communications, and Cardi B's communications with Defendants QC, Lee, Thomas, and Foster, Cardi B barred Shaft from further participating in the album that Atlantic Records was planning to release in the coming spring.  Upon information and belief, she instructed the record label's staff and others involved in the project to stop communicating with Shaft, WorldStar, and KSR.  Up to this time, Shaft was a fixture in the studio with Cardi B.  He had been instrumental in working with Cardi B to create several tracks for the new album.

38. Thomas and Lee then contacted Shaft on at least two occasions, and Lee met with Shaft in person.  During those contacts, Thomas and Lee acknowledged, among other things, WorldStar's exclusive management agreement with Cardi B.  They told Shaft they wanted to "make things work," which, in their view, was negotiating a termination of that agreement so they could replace WorldStar as Cardi B's managers.

39. But when Thomas and Lee failed to achieve a termination of the WorldStar agreement, they disregarded WorldStar's exclusive management rights over Cardi B's entertainment career and signed her to a management agreement with QC.  Together with Foster, they created the circumstances that enabled QC to close the deal.

40. Through their intentional interference with WorldStar's exclusive management agreement with Cardi B, Defendants QC, Lee, Thomas, and Foster have deprived WorldStar of the exclusive rights that it bargained for and the millions of dollars in management commissions it would earn from her entertainment services. The agreement ends no earlier than March 2020, inclusive of its automatic options.

41. In April 2018, operating with the new QC management team, Cardi B has released *Invasion of Privacy,* her first studio album on Atlantic Records.  The day of its release, the album ascended to Gold status as certified by the RIAA.  *Bodak Yellow*, which Shaft had co-produced, is the driving force behind the album's success.  The album sat atop the *Billboard 200*, the list of the top 200 albums/EPs in the United States, and now sits at No. 2.

42. A cult figure only two years ago, Cardi B is the "toast of the town," receiving celebratory congratulations from fans, celebrities, and fellow artists from around the world.  She has blanketed magazine covers and made numerous appearances to promote her new album, including on the late-night talk show circuit.  On the weekend of the album's release, Cardi B was the coveted featured "musical guest" on the popular variety-television show *Saturday Night Live*. With her growing success, she has amassed over 22 million Instagram followers.

43. Despite Shaft's pivotal role introducing Cardi B to the marketplace as the hottest newcomer, she has betrayed him, discarding WorldStar's management team for QC's team, and making false and disparaging statements about Plaintiffs' honesty.  She has repeated to others in

the music industry, including members of her entourage and her fiancé Offset, the lie that Shaft was "robbing" her.

44. On March 27, 2018, Cardi B double-downed on her disparagement of Shaft and his companies by making publicly available a video stream using Instagram's live broadcasting capability (the "Cardi B Instagram Live Post") in which she says: "There's a lot of people that I had to cutoff, a lot of friends, a lot of management, a lot of people that I had to cutoff because … one thing I notice … people don't give a f[*]ck about you."

45. As evidenced by the posts and comments on the Internet, the Cardi B Instagram Live Post has been reasonably understood by members of the public to mean that Shaft and his businesses were stealing from her and otherwise not serving her best interests.  Cardi B never corrected the false belief that they robbed her, thereby validating that falsehood by her silence.

46. A version of the Cardi B Instagram Live Post is available on YouTube through the account Youtube Tea and is titled "Cardi B Goes Off On Manager Who She Caught Stealing From Her."  The post was published on March 27, 2018, and has garnered over 17,000 views and over 80 comments.

47. The Cardi B Instagram Live Post was also covered by TeaTenders, a popular gossip blog available on Instagram (@teatenders_liv), which has over 225,000 followers.  TeaTenders posted the following:

> **Teatenders_liv** … Damnnnnnn.., Cardi's been going through it after finding out her long-time mentor/manager has allegedly been stealing from her … Cardi had mentioned in recent live that she couldn't trust anybody when it comes to her money … And that she was switching management.
>
> * * *

48. The TeaTenders post was "Liked" by at least 5,100 Instagram accounts.  And there are approximately 500 comments concerning the post's contents.  The following are some of the

disparaging posts spurred by the Cardi B Live Instagram Post by Instagram users concerning Shaft

and his businesses:

> **Peacefulsoul2** Honestly, you really cant trust nobody! This industry is wicked
>
> \* \* \*
>
> **cent188** Really messed up.  I wonder how many people were apart of the management
>
> \* \* \*
>
> **melaninmalik** Damn big L for KRS smh [shaking my head]
>
> \* \* \*
>
> **webeunruly** previous management ain't sh[\*]t .. she was bringing in money and paying and u still gon steal \*\*\*
>
> \* \* \*
>
> **beautiful.bii**@niamiava she said they were making deals behind her back
>
> \* \* \*
>
> **lisiamarie** Can't trust nobody!Smh
>
> \* \* \*
>
> **pressuredy** That's f[\*]cked up how you steal from someone making U MONEYYY
>
> \* \* \*
>
> **Glow_g_** Dam! That's f[\*]cked up smh … how you do that to someone making you $$$$$ #No LOYALTY OR RESPECT ANYMORE…
>
> \* \* \*
>
> **jariaae**@glow_g_ they was stealing her money
>
> \* \* \*
>
> **Jamange18908@shesocute24** naaw she was dumb to not see she was being robbed.  Now sis is smart. …
>
> \* \* \*
>
> **youcouldneeeevaaa** Her KSR team was stealing from her and booking shows behind her back only for them, her old managers, to take money. That could get her sued! That's what's been happening recently and why some of her stuff was cancelled. QC will take care of her I'm sure and she can leave at any time if they mess her over too.
>
> \* \* \*
>
> **mommieandz** NO SHADE …KSR=KEEP SOME REVENUE AWEFUL …
>
> \* \* \*
>
> **Xoprettylexx** Sooo shaft was stealing from her? Smh
>
> \* \* \*
>
> **mountainhigh_7887** That's a damn shame.  Money changes people. Good she discovered before the stealing got worse.  A damn shame.

* * *

**Whats_good921**. Who shaft.!?  Wtf that's so f[*]cked up WTF.

* * *

**thelightskincutie.2** Dangggg  KSR  whybu  do  sis  like  that  …
#trapselena

* * *

**bouyaayoub** I hate it when people steal in these type of situations
… just count your blessings and your money…

* * *

**tuesday.reuben** Dang how low do u have to b to steal

* * *

**Faven_** Omg wow shaft been working with her for a lonnnnggggg
time ***

* * *

**tavion._**Damn that so f[*]cked up.  That whole management team
was on a come up thanks to Cardi and they got the nerve to steal
$$$$ from her.  SMFH

* * *

**ricky_ricky6214** Shaft tho

49. Cardi B's public statements about Shaft and his companies, which she knew to be untrue at the time she made them, have materially sullied and damaged Shaft's image and reputation in the music industry and the businesses through which he provides entertainment services, including as a manager and record company.

50. On April 18, 2018, Cardi B posted on her Instagram account (@iamcardib) the following: "Me trynna find the person that's been spending my money."  This taunt, was, upon information and belief, directed by Cardi B at Shaft.  And its meaning was not lost on her followers, including one who responded: "Shaft a/k/a @ksrgroup aka @iamshaft."  Cardi B's defamatory statements will cause lasting reputational damage to Shaft and his businesses.

## THE AGREEMENTS

### A.  The Management Agreement

51. In early 2015, Cardi B and WorldStar executed a written agreement titled "Management Agreement."  The agreement provides that, when signed by both parties, it "will constitute a complete and binding agreement … between [Cardi B] and [WorldStar] with respect to [Cardi B's] engagement of [WorldStar] as [her] exclusive personal manager[.]"  Cardi B signed the Management Agreement before a notary public.

52. Paragraphs 1 and 2 grant WorldStar the right to be her "exclusive personal manager" throughout the world in all of her entertainment endeavors, and obligates it to "confer with, counsel, guide and advise [her] in all matters pertaining to [her] career in the entertainment and amusement industries, including, without limitation, in connection with [her] live performances, personal appearances, recording and producing of musical and lyrical material, music publishing, motion pictures, legitimate theater, television, concerts, the use of [her] name, likeness and biographical information for commercial or promotional purposes and the sale … of musical, literary, dramatic or other artistic material which [she] may create, compose or acquire[.]"

53. In paragraph 3, Cardi B grants WorldStar an "initial period of one (1) year[,]" beginning March 3, 2015, and four "irrevocabl[e]" options to extend the initial term for "up to four (4) consecutive additional periods of one (1) year each[.]"  The options are automatically renewable "unless [WorldStar] shall give [Cardi B] written notice to the contrary at any time prior to the date" of the beginning of each option period.  WorldStar has not provided Cardi B any such notice.

54. In paragraph 4(a), the parties agree that WorldStar is to be paid "twenty percent (20%) of [Cardi B's] Gross Income" during the term.  In paragraph 4(b), "Goss Income" was

broadly defined, subject to a list of exceptions, as "any and all gross monies or other considerations earned, paid or payable to [Cardi B] or on [her] behalf … in connection with [her] services and activities in the Entertainment Industries[.]"

55. In paragraph 8, Cardi B makes several representations, including that she is not "under any disability, restriction or prohibition … with respect to [her] right to execute" the Management Agreement "or to perform fully all of its terms and conditions[.]"

56. In paragraph 10, to express their mutual desire to "make specific and definite, and/or to eliminate, if possible, any controversy" between them, Cardi B and WorldStar agree that if any party "believe[s] that the terms of this [Management] Agreement are not being fully and faithfully performed," then the accuser will provide written notice to the other identifying the "specific nature of any such claim, non-performance or misfeasance" along with thirty days to cure such breach.  Cardi B has not provided any such notice.

57. In paragraph 11, the parties "specifically acknowledge that each … ha[s] been advised to seek [their] own independent counsel concerning the interpretation and legal effect of [the Management] Agreement and (ii) ha[s] either obtained such counsel or ha[s] intentionally refrained from doing so and ha[s] knowingly and voluntarily waived such right."

**B.   The KSR Recording Agreement**

58. In 2016, KSR and Cardi B executed the written agreement titled "Recording Agreement" (the "KSR Agreement") in which she agrees "to render [her] services exclusively to [KSR] as a recording artist for the Term … throughout the universe[.]"  Cardi B signed the KSR Agreement before a notary public.

59. Under paragraph 1, KSR obtains the "exclusive right during the Term to solicit a recording agreement with [a] third party record label (the 'Distributor')[,] pursuant to which [KSR]

shall have the right to (i) deliver recordings to the Distributor for distribution … throughout the world; and/or (ii) furnish [Cardi B's] exclusive services as a recording artist in the music industry to the Distributor, and otherwise assign all of [KSR's] rights under this [KSR] Agreement to Distributor (… referred to herein as the 'Distribution Agreement')."

60. Paragraph 1 further provides that if KSR secures a Distribution Agreement, then the KSR Agreement will be "deemed co-extensive with the term of the Distribution Agreement[;]" Cardi B will "comply with all of the terms and conditions of the [KSR] Agreement and the Distribution Agreement" so that KSR can comply with its obligations under the Distribution Agreement; and Cardi B will "execute any letters of inducement and any other documents necessary or desirable to effectuate" compliance with those agreements.

61. Under paragraph 2, Cardi B agrees that during the "Initial Term" she will deliver not less than two recordings that are "commercially and technically acceptable." She also grants KSR six irrevocable, automatic, and consecutive options to extend the Term and agrees to deliver one album during each such option period.

62. In paragraph 3, KSR agrees that if it enters into a Distribution Agreement, then it will "instruct the Distributor to account to [Cardi B] directly for fifty … percent of all net advances and royalties otherwise payable to [KSR] pursuant to the Distribution Agreement." Cardi B agrees to "be subject to the same provisions affecting [KSR] in connection with royalties accounted to [KSR] by Distributor."

63. In paragraph 5, Cardi B grants KSR the right to participate in her financial success in the entertainment industry by entitling KSR to a percentage of "of all compensation earned by [her] in [the] Entertainment Industry resulting from any agreements substantially negotiated during

the Term of th[e] [KSR] Agreement or within 6 months following the end of the Term," which is called the "Revenue Share."

64. The "Revenue Share" includes, without limitation "live concert performances, merchandising, endorsements, songwriting, music publishing (but music publishing and songwriting is excluded in the event [KSR] acquire[s] music publishing rights from [Cardi B]), record producing, scripted and non-scripted television performances, dramatic acting, any exploitation of [her] name or likeness in any capacity or for any reason ('Gross Compensation')."

65. In paragraph 6, if KSR secures a Distribution Agreement for Cardi B, then Cardi B, her publishing entity, and any company or person controlled by her, agrees to assign to KSR's music publishing affiliate "an undivided fifty percent … interest of [her] entire interest, and the sole and exclusive right to administer [KSR's] share of [her] rights granted [to KSR] for the length of copyright throughout the world, in each and every musical composition  … written by [her] during the Term … as well as any musical composition written by [her] and embodied on an Existing Master or Video … ."  Paragraph 6 also provides that KSR has exclusive administration rights over Cardi B's and KSR's "copyright interest in the Compositions throughout the world for the length of copyright[.]"

66. In paragraph 8, Cardi B grants KSR the sole and exclusive rights in "[a]ll of the audio and audiovisual recordings" made by her under the KSR Agreement, including certain existing master recordings and videos (paragraph 9), "throughout the Territory in perpetuity[.]"

67. In paragraph 10, Cardi B grants, among other things, name and likeness rights to KSR in perpetuity to permit it and "others to use [her] name (both legal and professional) and approved likeness … for advertising and purposes of trade, and otherwise without restriction, in connection with the exploitation of phonograph records."

68. In paragraph 13, Cardi B warrants and represents that, among other things, she is under "no disability, restriction or prohibition … with respect to [her] right to execute th[e] [KSR] Agreement and perform its terms and conditions, and with respect to [her] right to record any and all selections hereunder."

69. Paragraph 14 provides that Cardi B "expressly acknowledge[s] that [her] services … are of a special, unique and intellectual character which gives them peculiar value, and that in the event of a breach by [her] of any term, condition or covenant hereof [KSR] will be caused irreparable injury."

70. Paragraph 14 further provides that if Cardi B "breach[es] any provision of th[e] [KSR] Agreement[,] [then KSR] shall be entitled to injunctive relief and other equitable relief and/or damages … in addition to any other rights or remedies available to [KSR], and [it] shall have the right to recoup any damages from any sums which may thereafter become due and payable to [Cardi B] hereunder, including sums otherwise payable to [her] after the expiration or termination of th[e] [KSR] Agreement."

**C.   The Atlantic Records Agreement**

71. In 2016, KSR entered into a distribution deal with Atlantic Records (the "Furnishing Agreement") in which it agrees to furnish the exclusive services of Cardi B "for the making of Recordings and Records" for an agreed initial term, together with four consecutive separate option periods.

72. Atlantic Records grants KSR approval and consent rights concerning various aspects of their contractual relationship.

73. Under paragraph 15(a)(i), KSR represents and warrants to Atlantic Records that Cardi B and KSR "have the right and legal capacity to enter into, execute and implement this

16

agreement, and [KSR] and [Cardi B] are not subject to any prior obligations or agreements …, which would restrict or interfere in any way with the full and prompt performance of [KSR's] obligations hereunder … ."

74. In paragraph 15(xii), KSR represents and warrants to Atlantic Records that it has "a valid and enforceable exclusive agreement with [Cardi B] under which [she] is required to perform exclusively for [KSR] as a recording artist, and that such agreement shall continue to be in full force and effect during the Term."

75. In paragraph 15(xii), KSR further represents and warrants that it would provide Atlantic Records with a copy of the KSR Agreement upon request and that KSR would "not waive, release or forfeit [its] exclusive rights to the services of" Cardi B; that it would "take all reasonable steps necessary or desirable to keep [its] agreement with [Cardi B] in full force and effect so that [Atlantic Records] shall have the benefits of [Cardi B's] exclusive services as a recording artist during the Term as if [she] had contracted directly with" Atlantic Records; and that it would "cause [Cardi B] to execute and deliver to [Atlantic Records] at the time of execution of" the Furnishing Agreement "the standard Artist Inducement Letter annexed" thereto.

**D.   The Cardi B Inducement Letter**

76. At or about the time that the Furnishing Agreement was executed, Cardi B executed the Artist Inducement Letter (the "Inducement Letter") "to induce [Atlantic Records] to execute" the Furnishing Agreement under which she was paid a substantial advance.

77. Cardi B recognized that signing the Inducement Letter was for her "benefit as a recording artist[.]"  The Inducement Letter is also signed by Atlantic Records and KSR, which each "ACCEPTED AND AGREED TO" its terms.

78. In paragraph 1 of the Inducement Letter, Cardi B warrants and represents that, among other things:

    a. She read the Inducement Letter, the KSR Agreement, and the Furnishing Agreement;

    b. She had "the opportunity to consult independent counsel of [her] own choice for the purpose of having the legal effect of each of the provisions contained in th[e] [Inducement Letter], the [KSR] Agreement and the [Furnishing] Agreement explained to [her], and [she] … either so consulted such independent counsel or knowingly and voluntarily waived [her] right to do so;"

    c. She "understand[s] that the [Inducement Letter] and the [KSR] Agreement are legally binding documents and that [she is] bound by the provisions contained in [the Inducement Letter] and the [KSR] Agreement;" and

    d. She "assent[s] to the execution of the [Furnishing] Agreement, agree[s] to be bound by all grants, restrictions, and other provisions of the [Furnishing] Agreement relating to [her] and affirm[s] all warranties and representations in the [Furnishing] Agreement, which relate to [her] including those in paragraph 15(a) of the [Furnishing] Agreement."

79. In paragraph 2, Cardi B "guarantee[s], absolutely and unconditionally, the full performance by [KSR] in the [Furnishing] Agreement relating to [her] services and in and to the results and proceeds of [her] services and [she] agree[s] to perform for [Atlantic Records'] benefit

18

all of the obligations relating to [her] services which were granted by [KSR] to [Atlantic Records] in the [Furnishing] Agreement and/or were granted by [her] to [KSR] in the [KSR] Agreement."

80. In paragraph 2, Cardi B acknowledges that Atlantic Records is entitled to all rights that she granted to KSR under the KSR Agreement, and that Atlantic Records is granted the right, in addition to any other remedies available to it at law or in equity or by reason of the Inducement Letter, the KSR Agreement, and/or the Furnishing Agreement, "to specifically enforce the provisions of the [Furnishing] Agreement and/or the [KSR] Agreement against [her] directly."

81. In paragraph 7, Cardi B warrants and represents that, among other things, she possesses "the right and power" to enter, perform, and grant the rights in the Inducement Letter, the KSR Agreement, and those provisions of the Furnishing Agreement relating to her performance.

82. Cardi B further acknowledges in paragraph 7 that Atlantic Records would not have entered into the Furnishing Agreement without her execution of the Inducement Letter, and that she has "not entered into (nor will enter into) any contract or commitment in conflict with any of the provisions of th[e] [Inducement Letter], the [KSR] Agreement or the [Furnishing] Agreement or that might interfere with or impair" the rights granted under the Inducement Letter or the Furnishing Agreement.

83. And, in paragraph 7, Cardi B "acknowledge[s] and agree[s] that … each party and its counsel reviewed and negotiated the terms and provisions of th[e] [Inducement Letter] and have contributed to its revision[.]"

## COUNT I
### (Breach of Contract Against Cardi B)

84. Plaintiff WorldStar repeats and realleges the allegations in paragraphs 1 through 83 as if set forth at length herein.

85. WorldStar and Cardi B executed the Management Agreement, which is a valid, binding, and enforceable contract.

86. WorldStar has fully performed its contractual obligations to Cardi B under the Management Agreement.

87. Nevertheless, Cardi B has materially breached the Management Agreement by, among other things, denying WorldStar the exclusive right to manage Cardi B in her entertainment career throughout the world.

88. For example, Cardi B materially breached the Management Agreement when she prevented WorldStar from fully participating in the recording process for her début album *Invasion of Privacy* and refused to communicate with WorldStar concerning any aspects of her entertainment career.

89. Cardi B also materially breached the Management Agreement when she instructed third parties, including Atlantic Records, not to communicate with WorldStar concerning her recording and other entertainment activities.

90. Cardi B also materially breached the Management Agreement when she refused to pay WorldStar management commissions from the consideration she received from her entertainment endeavors.

91. Cardi B also materially breached the covenant of good faith and fair dealing under the Management Agreement.

92. Despite providing Cardi B with notice of her material breaches of the Management Agreement, she has failed and refused to cure them.

93. Cardi B's material breaches of contract have denied WorldStar its management commissions and other benefits, and will continue to deny WorldStar its rights under the Management Agreement.

94. WorldStar has been damaged, and will continue to be damaged, by reason of Cardi B's material breaches of the Management Agreement.

95. Accordingly, WorldStar demands judgment against Cardi B in an amount to be determined at trial, but not less than $10,000,000.

## COUNT II
**(Unjust Enrichment Against Cardi B)**

96. WorldStar repeats and realleges the allegations in paragraphs 1 through 95 as if set forth at length herein.

97. If the Management Agreement is found to be invalid or unenforceable, then WorldStar is entitled to the reasonable value of its work, labor, and services, which it performed in good faith for Cardi B.

98. In addition, Cardi B has been, and will continue to be, unjustly enriched by retaining the just compensation and other benefits WorldStar should receive for its personal management services.

99. The compensation and other benefits that Cardi B has retained and profited from, and which she will continue to receive and withhold, rightfully belong to WorldStar, and should in equity and good conscience be paid to WorldStar.

100. Accordingly, WorldStar demands judgment against Cardi B in an amount to be determined at trial, but not less than $10,000,000.

## <u>COUNT III</u>
### (*Quantum Meruit* Against Cardi B)

101. WorldStar repeats and realleges the allegations in paragraphs 1 through 100 as if set forth at length herein.

102. If the Management Agreement is found to be invalid or unenforceable, then WorldStar is entitled to the reasonable value of its work, labor, and services, which it performed in good faith for Cardi B.

103. Cardi B engaged WorldStar to personally manage her career throughout the world in all of her entertainment endeavors, including, without limitation, live performances, personal appearances, concerts, recording and producing of music, publishing, television, and the use of her name and likeness.

104. WorldStar fully performed its work, labor, and services at the specific instance and request of Cardi B with the understanding and expectation that WorldStar would be compensated for its reasonable value.

105. Having accepted the benefits of WorldStar's work, labor, and services, Cardi B achieved professional and financial success in the entertainment industry.

106. Cardi B's conduct has denied, and will continue to deny, WorldStar the reasonable value of its work, labor, and services performed on Cardi B's behalf.

107. Cardi B's failure and refusal to pay WorldStar for the reasonable value of its work, labor, and services has caused, and will continue to cause, it to suffer damages.

108. Accordingly, WorldStar demands judgment against Cardi B in an amount to be determined at trial, but not less than $10,000,000.

Case 1:18-cv-03710   Document 1   Filed 04/26/18   Page 23 of 35


## COUNT IV
### (Declaratory Judgment Against Cardi B)

109. WorldStar repeats and realleges the allegations in paragraphs 1 through 108 as if set forth at length herein.

110. An actual and justiciable controversy exists between WorldStar, on the one hand, and Cardi B, on the other hand, such that WorldStar requests this Court to declare, among other things, that the Management Agreement is a valid, binding, and enforceable agreement through its full term.

111. A declaration by this Court is necessary and vital to determine and validate WorldStar's rights and interests in the Management Agreement to compel its enforcement.

112. WorldStar has no adequate remedy at law.

113. Accordingly, WorldStar requests a declaratory judgment validating its rights and interests in the Management Agreement and compelling the enforcement of that agreement through its full term.

## COUNT V
### (Breach of Contract Against Cardi B)

114. KSR repeats and realleges the allegations in paragraphs 1 through 113 as if set forth at length herein.

115. KSR and Cardi B executed the KSR Agreement, which is a valid, binding, and enforceable contract.

116. The KSR Agreement entitles KSR, among other things, to furnish Cardi B's exclusive services as a recording artist in the music industry and to deliver her recordings to a then yet-to-be-determined distributor for distribution throughout the world.

117. KSR has fully performed its contractual obligations to Cardi B under the KSR Agreement.

118. Nevertheless, Cardi B has materially breached the KSR Agreement by, among other things, failing to render her exclusive services to KSR as a recording artist.

119. For example, Cardi B materially breached the KSR Agreement when she precluded KSR from performing under the KSR Agreement; refused to communicate with and/or respond to communications from KSR; excluded KSR from the recording process with Atlantic Records; instructed third parties, including Atlantic Records, not to communicate or otherwise engage with KSR; denied KSR its Revenue Share from her entertainment endeavors; denied KSR publishing and administration rights; deprived KSR of the rights to her prior master recordings; and denied KSR use of her name and likeness rights.

120. Cardi B materially breached the covenant of good faith and fair dealing under the KSR Agreement.

121. Despite providing Cardi B with notice of her material breaches of the KSR Agreement, she has failed and refused to cure them.

122. Finally, Cardi B's material breaches of contract have denied KSR its rights and benefits under the KSR Agreement, and will continue to deny its rights under the KSR Agreement.

123. KSR has been damaged, and will continue to be damaged, by reason of Cardi B's material breaches of the KSR Agreement.

124. Accordingly, KSR demands judgment against Cardi B in an amount to be determined at trial, but not less than $10,000,000.

## COUNT VI
### (Unjust Enrichment Against Cardi B)

125. KSR repeats and realleges the allegations in paragraphs 1 through 124 as if set forth at length herein.

126. If the KSR Agreement is invalid or unenforceable, then KSR is entitled to the reasonable value of its work, labor, and services, which it performed in good faith for Cardi B.

127. In addition, Cardi B has been, and will continue to be, unjustly enriched by retaining the just compensation and other benefits that KSR should receive for its work, labor, and services it has provided to Cardi B.

128. The compensation and other benefits that Cardi B has retained, and which she will continue to receive and withhold, rightfully belong to KSR, and should in equity and good conscience be paid to KSR.

129. Accordingly, KSR demands judgment against Cardi B in an amount to be determined at trial, but not less than $10,000,000.

## COUNT VII
### (*Quantum Meruit* Against Cardi B)

130. KSR repeats and realleges the allegations in paragraphs 1 through 129 as if set forth at length herein.

131. If the KSR Agreement is found to be invalid or unenforceable, then KSR is entitled to the reasonable value of its work, labor, and services, which it performed in good faith for Cardi B.

132. Cardi B engaged KSR to find a distributor for her recordings and to deliver them to the distributor for distribution throughout the world.

133. KSR has fully performed its services at the specific instance and request of Cardi B with the understanding and expectation that it would be compensated for the reasonable value of its work, labor, and services.

134. Having accepted the benefits of KSR's work, labor, and services, Cardi B has achieved professional and financial success in the entertainment industry as a recording artist.

135. Cardi B's conduct has and will continue to deny KSR the reasonable value of its compensation and other benefits it is entitled to receive during the full term of the Atlantic Agreement.

136. Cardi B's failure and refusal to pay KSR for the reasonable value of its work, labor, and services has caused, and will continue to cause, it to suffer damages.

137. Accordingly, KSR demands judgment against Cardi B in an amount to be determined at trial, but not less than $10,000,000.

<u>COUNT VIII</u>
**(Declaratory Judgment Against Cardi B)**

138. KSR repeats and realleges the allegations in paragraphs 1 through 137 as if set forth at length herein.

139. An actual and justiciable controversy exists between KSR, on the one hand, and Cardi B, on the other hand, such that KSR requests this Court to declare, among other things, that the KSR Agreement is a valid, binding, and enforceable agreement through its full term.

140. A declaration by this Court is necessary and vital to determine and validate the rights and interests of KSR and to compel its enforcement.

141. KSR has no adequate remedy at law.

142. Accordingly, KSR requests a declaratory judgment validating KSR's rights and interests in the KSR Agreement and compelling the enforcement of that agreement through its full term.

## COUNT IX
### (Tortious Interference with Contract Against Foster, QC, Lee, and Thomas)

143. WorldStar repeats and realleges the allegations in paragraphs 1 through 142 as if set forth at length herein.

144. The Management Agreement is a valid, binding, and enforceable contract between WorldStar and Cardi B.

145. Defendants Foster, QC, Lee, and Thomas had actual knowledge of the Management Agreement and its terms.

146. Defendants Foster, QC, Lee, and Thomas worked in concert to induce and procure material breaches of the Management Agreement by Cardi B.

147. Defendants Foster, QC, Lee, and Thomas intentionally and unjustifiably interfered with the Management Agreement and procured its breach by Cardi B.

148. But for the acts of intentional interference committed by Defendants Foster, QC, Lee, and Thomas, Cardi B would not have materially breached the Management Agreement.

149. Because of the tactics used by Defendants Foster, QC, Lee, and Thomas, Cardi B has denied, and will continue to deny, WorldStar the management commissions and other benefits it is entitled to receive under the Management Agreement.

150. The intentional interference with the Management Agreement by Defendants Foster, QC, Lee, and Thomas lacked justification.

151. As a direct result of the intentional interference committed by Defendants Foster, QC, Lee, and Thomas, WorldStar has suffered, and will continue to suffer, damages and demands judgment in an amount to be determined at trial, but not less than $10,000,000.

## COUNT X
### (Defamation *Per Se* Against Foster)

152. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 151 as if set forth at length herein.

153. Defendant Foster falsely stated that Plaintiffs were "robbing" Cardi B and cheating her out of money and opportunities by making side deals at her expense and damage (the "Foster Statements").

154. Foster communicated this lie to Cardi B and others even though Foster knew it to be untrue when she made that statement.

155. Plaintiffs have never robbed Cardi B or otherwise cheated her.

156. The Foster Statements are malicious and false statements of fact that expose Plaintiffs to hatred, contempt or aversion, or induces an evil or unsavory opinion of Plaintiffs in the minds of a substantial number of the community and music industry.

157. The Foster Statements, which are about Plaintiffs, were published by Foster without privilege or authorization.

158. In publishing the Foster Statements, Foster acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible persons.

159. In publishing the Foster Statements, Foster also acted maliciously, oppressively, with an improper and evil motive, and with knowledge that the Foster Statements were false, or in reckless or conscious disregard of the truth.

28

160. Foster knew the negative impact the Foster Statements would have on Plaintiffs' reputations in the community and music industry.

161. Because Foster charged Plaintiffs with the serious crime of robbery, the Foster Statements are defamatory *per se*.

162. The Foster Statements are also defamatory *per se* because they would tend to injure Plaintiffs in their trade, business, or profession.

163. These acts have caused, and will continue to cause, damage to Plaintiffs, including, without limitation, in the form of future lost earning capacity and the reasonable expectation of the loss of current and/or future clients.

164. Shaft has suffered and will continue to suffer non-economic damages, such as personal humiliation, emotional distress, and damage to his reputation and standing in the community.

165. Plaintiffs demand judgment against Foster in an amount to be determined at trial, but not less than $10,000,000.

## COUNT XI
### (Defamation *Per Se* Against Cardi B)

166. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 165 as if set forth at length herein.

167. Cardi B has publicly and privately stated to Offset and others that Shaft is "robbing" her while serving in his various capacities at WorldStar and KSR (the "Cardi B Statements").

168. Plaintiffs have never robbed Cardi B or otherwise cheated her.

169. The Cardi B Statements are malicious and false statements of fact that expose Plaintiffs to hatred, contempt or aversion, or induces an evil or unsavory opinion of Plaintiffs in the minds of a substantial number of the community.

170. The Cardi B Statements, which are about Plaintiffs, were published by Cardi B without privilege or authorization.

171. In publishing the Cardi B Statements, Cardi B acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible persons.

172. In publishing the Cardi B Statements, Cardi B also acted maliciously, oppressively, with an improper and evil motive, and with knowledge that the Cardi B Statements were false, or in reckless or conscious disregard of the truth.

173. Cardi B knew the negative impact the Cardi B Statements would have on Plaintiffs' reputations in the community and music industry.

174. Because Cardi B has charged Plaintiffs with the serious crime of robbery, the Cardi B Statements are defamatory *per se*.

175. The Cardi B Statements are also defamatory *per se* because they would tend to injure Plaintiffs in their trade, business, or profession.

176. These acts have caused, and will continue to cause, damage to Plaintiffs, including, without limitation, in the form of future lost earning capacity and the reasonable expectation of the loss of current and/or future clients.

177. Shaft has suffered, and will continue to suffer, non-economic damages, such as personal humiliation, emotional distress, and damage to his reputation and standing in the community.

178. Plaintiffs demand judgment against Cardi B in an amount to be determined at trial, but not less than $10,000,000.

**COUNT XII**
**(Defamation *Per Se* Against Cardi B)**

179. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 178 as if set forth at length herein.

180. The Cardi B Instagram Live Post is a malicious and false statement of fact that exposes Plaintiffs to hatred, contempt or aversion, or induces an evil or unsavory opinion of Plaintiffs in the minds of a substantial number of the community.

181. The Cardi B Instagram Live Post contains a false statement of fact concerning Plaintiffs because in that post Cardi B specifically references her "management," stating that she had to cutoff a lot of people, including her "management" because one thing Cardi B has "notice[d]" is that "people don't give a f[*]ck about you."

182. If the Cardi B Instagram Live Post is not a false statement of fact, it implies that it is based on defamatory facts, which are not disclosed to those hearing it, and that underlie Cardi B's statement that Plaintiffs do not "give a f[*]ck about" her.

183. Cardi B published the Cardi B Instagram Live Post by broadcasting the post to over 31,000 Instagram users.

184. Cardi B published the Cardi B Instagram Live Post without privilege or authorization.

185. In publishing the Cardi B Instagram Live Post, Cardi B acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible persons.

186. In publishing the Cardi B Instagram Live Post, Cardi B also acted maliciously, oppressively, with an improper and evil motive, and with knowledge the post was false, or in reckless or conscious disregard of the truth.

187. The Cardi B Instagram Live Post is defamatory *per se* because the post would tend to injure Plaintiffs in their trade, business, or profession.

188. The publication of the Cardi B Instagram Live Post has caused, and will continue to cause, damage to Plaintiffs, including, without limitation, in the form of future lost earning capacity and the reasonable expectation of the loss of current and/or future clients.

189. Shaft has suffered, and will continue to suffer, non-economic damages, such as personal humiliation, emotional distress, and damage to his reputation and standing in the community

190. Plaintiffs demand judgment against Cardi B in an amount to be determined at trial, but not less than $10,000,000.

**WHEREFORE**, Plaintiffs respectfully requests judgment as follows:

(a) On Count I, damages in an amount to be determined at trial, but not less than $10,000,000;

(b) On Count II, damages in an amount to be determined at trial, but not less than $10,000,000;

(c) On Count III, damages in an amount to be determined at trial, but not less than $10,000,000;

(d) On Count IV, a declaratory judgment declaring the Management Agreement a valid, binding, and enforceable agreement through its full term;

(e) On Count V, damages in an amount to be determined at trial, but not less than $10,000,000;

(f) On Count VI, damages in an amount to be determined at trial, but not less than $10,000,000;

(g) On Count VII, damages in an amount to be determined at trial, but not less than $10,000,000;

(h) On Count VIII, a declaratory judgment declaring the KSR Agreement a valid, binding, and enforceable agreement through its full term;

(i) On Count IX, damages in an amount to be determined at trial, but not less than $10,000,000;

(j) On Count X, damages in an amount to be determined at trial, but not less than $10,000,000;

(k) On Count XI, damages in an amount to be determined at trial, but not less than $10,000,000;

(l) On Count XII, damages in an amount to be determined at trial, but not less than $10,000,000;

(m) On all Counts, interest, costs, and attorneys' fees under all applicable laws, rules or statutes;

(n) Punitive damages on all Counts supporting such an award; and

(o) Such other and further relief as this Court deems just and proper.

Dated:   April 26, 2018
         New York, New York

JONATHAN D. DAVIS, P.C.

By: _____

Jonathan D. Davis, Esq.
Derek A. Williams, Esq.
10 Rockefeller Plaza
Suite 1015
New York, New York 10020
(212) 687-5464

*Attorneys for Plaintiffs WorldStar
Marketing Group, Inc., KSR Group,
LLC, and Klenord Raphael*

34

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby

demand a trial by jury.

Dated: April 26, 2018
New York, New York

JONATHAN D. DAVIS, P.C.

By: _____

Jonathan D. Davis, Esq.
Derek A. Williams, Esq.
10 Rockefeller Plaza
Suite 1015
New York, New York 10020
(212) 687-5464

*Attorneys for Plaintiffs WorldStar
Marketing Group, Inc., KSR Group,
LLC, and Klenord Raphael*